■ In the Matter of JOSHUA J. WESTCHESTER COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; DERRICK K., Appellant, et al., Respondent. [968 NYS2d 140]—

In a child protective proceeding pursuant to Family Court Act article 10, the father appeals from (1) a decision of the Family Court, Westchester County (Colangelo, J.), dated August 18, 2011, made after a fact-finding hearing, and (2) an order of fact-finding and disposition of the same court, dated November 11, 2011, which, upon the decision, inter alia, found that he neglected the subject child.

Ordered that the appeal from the decision is dismissed, without costs or disbursements, as no appeal lies from a decision (*see Schicchi v J.A. Green Constr. Corp.*, 100 AD2d 509 [1984]); and it is further,

Ordered that the order of fact-finding and disposition is reversed, on the facts, without costs or disbursements, the petition is denied, and the proceeding is dismissed.

The subject child, Joshua, who was born in February 2006, lived with his father from May 2006 until September 2006, after which time he resided with his mother. Thereafter, pursuant to an order entered upon consent on September 17, 2007, the mother was awarded sole legal and physical custody of Joshua. Subsequently, in August 2008, Joshua was removed from the mother's care after an adjudication that she had neglected him. At that point, Joshua was placed in the care and custody of the petitioner, Westchester County Department of Social Services (hereinafter the DSS). Pursuant to a second modified permanency hearing order entered September 20, 2010, Joshua was placed with the father, who appeared as a nonparty in a neglect proceeding commenced by the DSS against the mother. Pursuant to that order, the father agreed to, inter alia, cooperate with the DSS's supervision, which was to include unannounced visits to his residence.

On October 29, 2010, after the father picked Joshua up at daycare, Joshua's teacher filed a report with the Statewide Central Register of Child Abuse and Maltreatment at ap-

proximately 4:50 p.m., as she was concerned about the father's behavior when he picked up Joshua that day. In response to Joshua's teacher's report, the DSS sent two workers from its Emergency Services Division unannounced to the father's residence at approximately 9:00 p.m. The father refused to allow the DSS Emergency Services workers into his apartment. Eventually the police forced their way into the apartment, and Joshua was immediately removed from the father's care. In December 2010, the DSS filed a petition alleging that the father neglected Joshua because, inter alia, he had refused to open the door to his apartment to the DSS Emergency Services workers or the police.

At the fact-finding hearing, the DSS Emergency Services workers testified that, after gaining access to the father's apartment building either through an open door or by someone letting them in, they proceeded to the father's apartment and knocked on the door. The father refused to open the door to the DSS Emergency Services workers, explaining that he did not open the door at night and telling them to return the next day. The DSS Emergency Services workers, after speaking to a supervisor, called the police for assistance. When the police knocked on the father's door, he still refused to open the door, explaining once again that he did not let anyone in whom he did not know. One of the workers called the father on the telephone, and the father stated that he would kill anyone who tried to enter his apartment. The police then left. Approximately two hours later, the DSS Emergency Services workers returned to the father's residence, where they were met again by the police. At that point, pursuant to a request by the DSS to remove Joshua from the home, the police forced their way into the residence, and arrested the father. The DSS Emergency Services workers found Joshua in the apartment, and he appeared clean, healthy, and safe. On inspection, the DSS Emergency Services workers observed a knife and baseball bat under the father's bed in the bedroom where the father slept. A small bruise was observed under Joshua's right eye the next day.

The father testified at the fact-finding hearing that since he had been robbed in the past and because people were always coming in and out of his apartment building, he did not open the apartment door after 9:00 p.m. as a precaution for Joshua's safety and his own. Further, he explained that, as an additional safety precaution, he kept a baseball bat and a kitchen knife under his bed in the bedroom where only he slept. He also testified that he was concerned that the DSS Emergency Services workers and police officers were impersonating public officials

as a means to gain entry into his apartment, and that when he called the police department to verify that police officers had been dispatched to his home, he was informed that there was no record of any officers being sent to his address. In addition, he stated that the mark under Joshua's eye was an injury Joshua had already sustained by the time that he moved in with the father in late September 2010.

After the fact-finding hearing, the Family Court, in a decision dated August 18, 2011, concluded that the father failed to comply with the terms and conditions of Joshua's placement with him, and described Joshua as a neglected child. The Family Court noted that, pursuant to the second modified permanency hearing order, the father agreed that the DSS would supervise the placement of Joshua with the father, and that the father would cooperate with, inter alia, unannounced visits to his residence. Thus, based on the father's failure to open the door to the DSS workers, the Family Court concluded that the father "neglected Joshua by neglecting his responsibilities to the entity ultimately charged by statutory directive to keep [Joshua] safe—the [DSS]." Thereafter, the Family Court issued an order of fact-finding and disposition, pursuant to which Joshua was found to be neglected by the father, and directed that Joshua be placed in foster care.

"To establish neglect pursuant to section 1012 (f) (i) (B) of the Family Court Act, the petitioner must prove, by a preponderance of the evidence, that (1) the child's physical, mental, or emotional condition has been impaired, or is in imminent danger of becoming impaired, and (2) the actual or threatened harm to the child is due to the failure of the parent or caretaker to exercise a minimum degree of care in providing the child with proper supervision or guardianship" (*Matter of Kiara C. [David C.]*, 85 AD3d 1025, 1025-1026 [2011]; *see Matter of Michael G.C. [Michael C.]*, 103 AD3d 890, 891 [2013]; *Matter of Ariella S. [Krystal C.]*, 89 AD3d 1092, 1093 [2011]). Any determination that a child is a neglected child must be based on a preponderance of the evidence (*see* Family Ct Act § 1046; *Matter of Dallas C. [Dusty M.C.—Richard C.]*, 103 AD3d 631 [2013]; *Matter of Kassandra V. [Sylvia L.]*, 90 AD3d 940, 941 [2011]).

Here, while the DSS properly sought access to Joshua under its order of supervision, it failed to prove at the fact-finding hearing by a preponderance of the evidence that the father neglected Joshua (*see e.g. Matter of Ariel P. [Lisa W.]*, 102 AD3d 795, 796 [2013]). The evidence did not establish that Joshua's physical, mental, or emotional condition was impaired, or was in imminent danger of becoming impaired, as a result of the

father's refusal to allow the DSS Emergency Services workers into his apartment. Moreover, the evidence established that the DSS Emergency Services workers found Joshua to be clean, healthy, and safe. Although there was a small bruise under Joshua's right eye, the Family Court found that the evidence relating to that bruise, discovered the day after Joshua was removed from the father's apartment, was ambiguous, and the court did not base its finding of neglect on the existence of the bruise. Thus, the only basis for the Family Court's determination that Joshua was neglected, as explained in its decision, was not established by the DSS by a preponderance of the evidence.

The parties' remaining contentions either are without merit or need not be addressed in light of our determination. Balkin, J.P., Hall, Austin and Cohen, JJ., concur.